UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-20133-CR-SEITZ/O'SULLIVAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MAURICE MARSHALL,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the Defendant's Motion to Suppress Evidence (DE# 40, 5/14/10). This case was referred to United States Magistrate Judge John J. O'Sullivan by the Honorable Patricia A. Seitz, United States District Court Judge for the Southern District of Florida. Having held an evidentiary hearing on May 24, 2010 and carefully considered the defendant's motion, the court file and applicable law, the undersigned respectfully recommends that the Defendant's Motion to Suppress Evidence (DE# 40, 5/14/10) be **GRANTED**.

## BACKGROUND

The defendant is charged by Indictment with conspiracy to possess with intent to distribute Oxycodone in violation of Title 21, United States Code, Section 846, possession with intent to distribute Oxycodone in violation of Title 21, United States Code, Section 841(a)(1), possession of a firearm by a convicted felon in violation of Title 18, United States Code, Section 922(g)(1) and possession of a firearm in furtherance of a drug trafficking offense in violation of Title 18, United States Code,

Section 924(c)(1)(A)(i). See Indictment (DE# 12, 3/5/10).

On May 14, 2010, the defendant filed the instant motion. See Defendant's Motion to Suppress Evidence (DE# 40, 5/14/10). The government filed its response on May 24, 2010. See United States' Response to Defendant's Motion to Suppress (DE# 45, 5/24/10). On May 24, 2010, the Court held an evidentiary hearing. The Court admitted into evidence Government's Exhibits 1 through 8. The defendant did not introduce exhibits. The following witnesses testified on the government's behalf: Detective Reynold Philippe, Detective Duriel Smith, Detective Wayne Cooper[1] and Special Agent Thomas Magiamele. The defendant presented the testimony of Arlene McCray. At the evidentiary hearing, the parties agreed that the only issues for the Court to decide were whether the police had reasonable suspicion to stop the vehicle transporting the defendant and whether the police had probable cause to search the defendant's bag.[2] Following the evidentiary hearing, the undersigned gave both parties an opportunity to submit additional case law supporting their position. On May 26, 2010, the government submitted United States's Notice of Supplemental Authority (DE# 49, 5/26/10). The defendant did not provide the undersigned with additional cases.

### FINDINGS OF FACT

In February, 2010, the Miami-Dade Police Department was involved in a narcotics investigation targeting a residence located at 613 N.W. 65 Street, Miami, Florida (hereinafter "residence") following a tip from a Confidential Informant

---

[1] Detective Cooper is retired from the police force.

[2] The government stated that it was not contesting the defendant's standing to challenge the search of the bag.

(hereinafter "CI"). Police arranged for a controlled purchase of narcotics from the residence to take place on February 3, 2010. On February 3, 2010, an "eyeball"[3] and a "360"[4] were stationed near the residence. On that date, undercover police officer Duriel Smith (hereafter "UC") and the CI parked at a restaurant near the residence around 8:00 p.m. The UC patted down the CI and ensured that the CI did not have contraband on his person. The UC advised the other units that he was going to the residence and exited the vehicle with the CI. The UC and the CI walked eastbound on NW 65 Street towards the residence. The residence had an entrance on the westside and an entrance on the eastside. The eastside entrance was accessible through a wooden gate. As the UC and the CI approached the wooden gate, they saw a black male walking out. The CI asked the black male if it was open. The black male responded that "yeah, they wide open and they fat," meaning that the location was active for drug sales and the product was good.

The eastside entrance had a black iron security bar door with a black mesh covering the space between the bars. A hole had been cut on the right side of the door so that drugs and money could be exchanged through it. The UC knocked on the door and a short black male with dreadlocks responded. The CI asked the man for "four hards," slang for rock cocaine, and the UC asked for one DP (powder cocaine) and a bag of weed. The total price of the drugs purchased was $35. After making the

---

[3] The term "eyeball" refers to an officer whose primary job is to survey the location.

[4] The term "360" refers to perimeter security, i.e., police units stationed north, south, east and west of the location.

purchase, the CI and UC left the residence and walked back to the vehicle. When the UC got inside the vehicle he radioed to the other units that "it's a go," meaning that the drug purchase had been successful.

On February 9, 2010, police sought to make a second controlled purchase. They setup an eyeball and 360 security around the residence. On that day, Detective Wayne Cooper was the eyeball. Detective Cooper parked his SUV in the parking lot[5] of an apartment building that was behind a field south of the property adjacent to the residence. Detective Cooper used binoculars to survey the residence.  Detective Cooper had a clear line of sight[6] of the front of the residence.

The UC and the CI parked at the restaurant near the residence around 8:30 p.m. The UC checked the CI to ensure that the CI was not in possession of contraband. When they approached the residence, they observed a black female on a cellular telephone, pacing in front of the residence. She was later identified as co-defendant Iris Gordon. The CI asked Ms. Gordon, "Cuzo, are you open?" Ms. Gordon pointed toward the wooden gate. The UC and the CI walked toward the wooden gate and Ms. Gordon went to the westside of the residence. The UC and the CI walked through the wooden gate, down the path and to the eastside entrance. The UC knocked and Ms. Gordon

---

[5] Detective Cooper did not park in a parking space, he parked next to the apartment building.

[6] The defendant presented testimony from Arlene McCray. Ms. McCray testified that she lived in the building west of Ms. Gordon's residence. According to Ms. McCray, she never saw anyone trim the palm trees on the westside of the residence, suggesting that Detective Cooper's view of the residence was obstructed by the palm trees. However, the undersigned credits Special Agent Thomas Magiamele's testimony that Exhibit 5 is a photograph taken on February 10, 2010, the day after the defendant's arrest. Exhibit 5 depicts neatly shorn palm trees on the westside of the residence.

answered the door. She asked the UC and the CI what they wanted. The CI responded that he wanted four hards (rock cocaine) and the UC asked for one DP (powder cocaine) and a bag of weed. The UC and the CI provided Ms. Gordon with the money. Ms. Gordon took the money, walked away from the door and returned with the drugs. The UC and the CI walked back to their vehicle and the UC radioed "it's a go," indicating that the narcotics purchase had been successful.

Soon after the UC had communicated the completion of the controlled narcotics purchase, Detective Cooper observed another black male walk up to the residence. Detective Cooper observed the black male engage in a short conversation with Ms. Gordon. Ms. Gordon then walked to the westside of the residence and the black male walked through the wooden gate. Several seconds later, Detective Cooper observed the black male walk out from the wooden gate. The black male started walking west, made an abrupt turn and proceeded east. Detective Cooper advised the other officers to stop this person. Before police could apprehend him, the black male walked into an apartment building.

Shortly thereafter, Detective Cooper observed a dark-colored Dodge Charger park in front of the residence. Detective Cooper observed an individual who was later identified as the defendant, exit the passenger side of the vehicle.[7] The defendant

---

[7] The defendant presented testimony from Ms. McCray that on February 9, 2010 she called the defendant and asked him to stop by her home because she needed money to play bingo. The defendant arrived at Ms. McCray's home between 5:00 and 6:00 p.m. The defendant gave Ms. McCray $50.00 for bingo, remained at her home for 15 to 20 minutes and left. Later that night, the defendant called Ms. McCray and told her that he had left his keys at her home. Ms. McCray confirmed that the defendant's keys were at her home and the defendant told her he would return to pick them up. The defendant retrieved his keys from Ms. McCray's home after 8:00 p.m. Ms. McCray's

engaged in a short conversation with Ms. Gordon. Detective Cooper observed the defendant hand "something" to Ms. Gordon. Ms. Gordon then entered the residence through the westside entrance. The defendant waited outside of the westside entrance by the door. Less than a minute later, Ms. Gordon came out of the residence with a medium sized black bag. Ms. Gordon handed the bag to the defendant. The defendant got in the passenger's side of the vehicle and left. Detective Cooper instructed the other officers to stop the defendant's vehicle.

    Law enforcement stopped the defendant's vehicle on 7th Avenue near 79th Street. The defendant's vehicle was stopped by three police units. The officers had their guns drawn as they approached the vehicle. One of the officers that stopped the vehicle was Detective Reynold Philippe. At the time of the stop, Detective Philippe had been advised that a transaction had taken place with one of the individuals in the vehicle. The officers detained the occupants of the vehicle.

    Detective Philippe holstered his gun and walked to the passenger side of the vehicle. Detective Philippe observed a black bag on the floor board of the passenger's side. Detective Philippe took the bag and placed it on the passenger seat. One of the pockets was open and Detective Philippe observed a large denomination of currency inside the bag. Detective Philippe asked the defendant about the money. The defendant responded that he sold compact discs ("CDs"). Detective Philippe observed

---

testimony does not negate the officers' testimony that the defendant was observed at Ms. Gordon's residence on February 9, 2010. Of note, when the defendant was interviewed following his arrest, he told Special Agent Magiamele that he went to the residence (Ms. Gordon's residence) to retrieve his keys but did not mention visiting Ms. McCray.

6

CDs in the bag. Detective Philippe opened the main pocket of the bag and saw a brown paper bag inside. Detective Philippe opened the brown paper bag and saw four clear sandwich bags containing a large quantity of pills. It was later determined that each bag contained 1,000 Oxycodone pills. After Detective Philippe found the drugs he told the other officers to put the defendant in handcuffs.

## ANALYSIS

**1.  Investigative Stop**

An investigative stop does not require probable cause. See Terry v. Ohio, 392 U.S. 1, 21 (1968). An investigative stop meets constitutional standards if the officer had a reasonable suspicion of criminal activity, based on articulable and specific facts known to him when the stop occurred. United States v. Thompson, 712 F.2d 1356, 1361 (11th Cir. 1983); United States v. Williams, 876 F.2d 1521, 1523 (11th Cir.1989) (noting that "police may stop and briefly detain a person to investigate a reasonable suspicion that he is involved in criminal activity, even though probable cause is lacking."). Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1 (1989), and from the collective knowledge of the officers involved in the stop. United States v. Cotton, 721 U.S. 350, 352 (11th Cir. 1983), cert. den. 465 U.S. 1108 (1984). Although this standard is considerably less demanding than probable cause, the Fourth Amendment nevertheless requires that the police officers articulate facts which provide some minimal, objective justification for the stop. Sokolow, 109 U.S. at 1585. Such facts may be derived from "various objective observations, information from police reports, if such are available, and consideration of

the modes or patterns of operation of certain kinds of lawbreakers." United States v. Cortez, 449 U.S. 411, 418 (1981). The government has the burden of proving reasonable suspicion and probable cause by a preponderance of the evidence. United States v. Salzano, 158 F.3d 1107, 1115 (10th Cir. 1998); United States v. Matlock, 415 U.S. 164, 177-78 n.14 (1974).

In the instant case, the government has established reasonable suspicion to stop the vehicle transporting the defendant. The defendant had just left a residence which was being used to sell drugs. The defendant was observed by police handing "something" to Ms. Gordon, a known drug dealer. Ms. Gordon was seen entering the residence and retrieving a black bag. Ms. Gordon was seen giving the defendant the black bag. Accordingly, police had reasonable suspicion to stop the vehicle.

**2.  Search of the Defendant's Bag**

The defendant argues that the government's search of his bag was unlawful. "[G]eneral[ly,] . . . warrantless searches are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir.1996) (quotations omitted). A warrantless search of an automobile may be conducted if: (1) there is probable cause to believe the vehicle contains contraband or other evidence which is subject to seizure under the law, and (2) exigent circumstances necessitate a search or seizure. United States v. Talley, 109 F.3d 277, 281 (11th Cir. 1997).[8] Probable cause

---

[8] Only a minimal showing of exigency is necessary to justify a warrantless search of an automobile. United States v. Alexander, 835 F.2d 1406, 1410 (11th Cir. 1988). The ability of a vehicle to become mobile is sufficient to satisfy the exigency requirement. Id. at 1409.

8

exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place. See Illinois v. Gates, 462 U.S. 213, 238 (1983). "[W]hen a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause." United States v. Wilson, 894 F. 2d 1245, 1254 (11th Cir. 1990) (citing United States v. Esle, 743 F. 2d 1465, 1476 (11th Cir. 1984)).

      The undersigned finds that the government lacked probable cause to believe that the automobile transporting the defendant contained contraband. The officers established surveillance of the residence on February 3, 2010 and February 9, 2010. The UC and the CI successfully purchased drugs from the residence on February 3, 2010 and February 9, 2010. On both occasions, the UC and the CI walked through the wooden gate on the westside of the entrance to a black iron door where the drug purchase took place. Both times, the UC and the CI purchased small quantities of narcotics. During the February 9, 2010 controlled drug purchase, Detective Cooper observed Ms. Gordon go to the westside entrance of the residence while the UC and the CI went to the eastside entrance. Detective Cooper observed this same behavior shortly after the UC and the CI's successful drug purchase, when an unidentified black male approached the residence and Ms. Gordon went to the westside of the entrance and the unidentified black male went to the eastside of the residence, presumably to purchase drugs. By contrast, when the defendant pulled up to the residence, Ms. Gordon did not motion to the defendant to go to the eastside of the residence where money and drugs were exchanged. Instead, the defendant handed "something" to Ms.

Gordon and Ms. Gordon went inside the residence on the westside entrance and returned with a black bag which Ms. Gordon handed to the defendant. The size of the black bag was not consistent with the small quantities of drugs purchased by the UC and the CI at the location. Additionally, when small quantities of drugs were purchased at the residence, the transactions took place behind a wooden gate to avoid detection. Ms. Gordon's transaction with the defendant took place in plain view. The undersigned finds that there were significant differences between the controlled drug purchases and the other suspected drug purchase and the defendant's exchange with Ms. Gordon, such that police did not have probable cause to believe that the defendant's bag contained contraband. Accordingly, the search resulting in the discovery of the Oxycodone violated the Fourth Amendment.

The government relies, inter alia, on United States v. Mathis, 239 Fed. Appx. 513 (11th Cir. 2007) (per curiam) and Untied States v. Martin, 190 Fed. Appx. 945 (11th Cir. 2006) (per curiam) in support of their argument that they had probable cause to search the bag. In Mathis, the Eleventh Circuit found that probable cause existed to search the defendant's duffle bag from the trunk of an automobile. Id. at 515. In that case, "[a]gents had knowledge of an anticipated drug deal, watched two men exchange the duffle bag, and later saw [the defendant] with the duffle bag. The agents then watched the duffle bag being placed in the trunk of [the automobile]." Id. The agent's knowledge of the anticipated drug deal in Mathis materially distinguishes Mathis from the facts of the instant case. Similarly in Martin, law enforcement officers had probable cause to believe the defendant's vehicle contained contraband where "[an officer] twice observed [the defendant] shake something out of [a] black container before replacing it in the

wheel well of the vehicle and then conduct what appeared to be a trade of the substance in the black container for money with an unidentified individual. Although [the officer] was unable to see what was taken out of the container or whether the substance removed from the container was actually traded to the unidentified individual . . .[he] testified that [the defendant's] actions clearly resembled a drug transaction." Id at 948. The Eleventh Circuit reasoned that the "[[the defendant's] repeated use of the black container and his obvious attempts to secrete it in the wheel well of the vehicle created a fair probability that the black container contained contraband." Id. Martin is distinguishable from the instant case because there were no attempts by the defendant or Ms. Gordon to secrete their interactions. By contrast, Ms. Gordon and others selling drugs at the residence took significant steps to secrete the drug sales that occurred at the eastside of the residence. Here, the defendant's interactions with Ms. Gordon, significantly differed from Ms. Gordon's modus operandi when selling drugs to customers. Accordingly, the officers did not have probable cause to believe the defendant's bag contained contraband.

## **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Defendant's Motion to Suppress Evidence (DE# 40, 5/14/10) be **GRANTED**. Pursuant to 28 U.S.C. §636(b)(1)(B) and (C), the parties may serve and file written objections to this Report and Recommendation with the Honorable Patricia Seitz, United States District Judge, on or before **Wednesday, June 2, 2010**.[9] See Nettles v. Wainwright, 677 F. 2d 404 (5th

---

[9] This matter is set for trial commencing on June 7, 2010.

11

Cir. 1982). **Any party filing an objection shall provide the Court with a copy of the hearing transcript.**

RESPECTFULLY SUBMITTED, in Chambers, at Miami, Florida this **28th** day of May, 2010.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
United States District Judge Seitz
All counsel of record